UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **NOV 1 8 2014**

-------------------------------------------------------------X

DIREXION SHARES, ETF TRUST,    :

                Plaintiff,    :

      -v-    :           14 Civ. 1777 (KBF)

                    :      OPINION & ORDER

LEVERAGED INNOVATIONS L.L.C,    :

                Defendant.    :

-------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

      Plaintiff and counterclaim-defendant Direxion Shares ETF Trust and

counterclaim-defendant Direxion Shares ETF Trust II (collectively "Direxion") move

for summary judgment against defendant and counterclaimant Leveraged

Innovations, LLC ("Leveraged") on the counterclaims and Direxion's own claim for a

declaration that Leveraged's infringement claims are barred by a prior settlement

agreement.

      The instant dispute spawns from the settlement agreement reached in a

patent infringement case from 2000 wherein Mopex, a predecessor-in-interest of

Leveraged, agreed not to sue "any AMEX-Listed ETF Fund." Leveraged pushed the

boundaries of what constituted an "AMEX-Listed ETF Fund" as defined in the

Mopex Settlement Agreement by subsequently bringing a patent infringement suit

against exchange traded funds ("ETFs") listed by a company called ProShares on

the NYSE Arca exchange. On April 20, 2012, this Court entered summary

judgment dismissing Leveraged's claim against the ProShares ETFs because NYSE

Arca is a successor of AMEX, and the ETFs listed thereon are accordingly protected

under the covenant not to sue.  <u>Leveraged Innovations, LLC v. NASDAQ OMX</u>

<u>Group, Inc., et al.</u>, No. 11 Civ. 3203, 2012 WL 1506524 (S.D.N.Y. Apr. 20, 2012)

("ProShares").

Once again, Leveraged is asserting that another company's ETFs – this time,

Direxion – used technology covered by its patents and has demanded royalty

payments in return for a non-exclusive license.  On March 14, 2014, Direxion filed

the instant action for declaratory judgment that Leveraged's patent claims against

them were released pursuant to the Mopex Settlement Agreement.  (ECF No. 2.)

Like the ProShares ETFs, Direxion ETFs are listed on NYSE Arca; accordingly,

Direxion argues that this same case has already been litigated – and Leveraged has

already lost.

Leveraged, however, asserts a new argument which it says was not

previously before the Court.  The covenant not to sue in the Mopex Settlement

Agreement extends only to ETFs that are "listed exclusively for trading on the

Amex."  It now argues that "listed exclusively" requires an affirmative obligation to

list only on one exchange.  And, while the Direxion ETFs are in fact only listed on

one exchange – NYSE Arca – Leveraged argues that because Direxion does not have

an exclusive listing agreement with NYSE Arca, it is outside the scope of the Mopex

Settlement Agreement.

Direxion moved for summary judgment on June 6, 2014; the motion was fully submitted as of August 26, 2014.[1] The Court heard oral argument on the motion on September 5, 2014.[2]

The motion presents two questions: (1) Does the phrase "listed exclusively" as used in the Mopex Settlement Agreement require an affirmative obligation to list only on one exchange? (2) If so, was the issue of interpreting the "listed exclusively" language in the Mopex Settlement Agreement previously litigated in ProShares such that collateral estoppel applies? As the Court finds no affirmative obligation to list on only one exchange, it need not address the collateral estoppel question.

For the reasons set forth below, summary judgment is GRANTED.

I.     BACKGROUND

Leveraged asserts three patents – U.S. Patent No. 7,698,192 (the "'192 patent"), U.S. Patent No. 7,917,422 (the "'422 patent"), and U.S. Patent No. 8,204,815 (the "'815 patent") (collectively, "the Patents") – against Direxion. (Responsive Statements of Undisputed Fact, "RSUF", ¶ 1.) Each of the three patents is a continuation of a previous application that became U.S. Patent No.

---

[1] Direxion submitted its reply brief on August 26, 2014 rather than on August 21, 2014, as set out in the Court's scheduling order. Leveraged filed a motion to strike the reply brief. (ECF No. 62.) The Court denied the motion at oral argument.

[2] On September 9, 2014, without prior permission from the Court, Leveraged submitted a supplemental brief and supplemental expert declaration on two questions that came up at oral argument: using custom and usage in construing an unambiguous contract, and transposing words that have an accepted meaning as terms of art (ECF No. 67). On September 15, 2014, Direxion requested that the Court disregard the "unauthorized, supplemental submission" and offered a brief substantive response. (ECF No. 68.) The Court disregards Leveraged's submission. Leveraged made it submission without permission and after all briefing had been submitted and oral argument on the motion had occurred. However, even if the Court considered the submission, it would nonetheless arrive at the same result.

3

6,088,685 (the "'685 patent"). (RSUF ¶ 2.) Leveraged is an assignee of the patents, which were previously owned by Mopex, Inc. ("Mopex"). (RSUF ¶ 3.)

A.     The Mopex Settlement Agreement

The '685 patent was the subject of litigation between Mopex and the American Stock Exchange LLC ("AMEX") in an action that commenced in 2000 before the Hon. Judge Scheindlin. See Am. Stock Exch., LLC v. Mopex, Inc., No. 00 Civ. 5943 (S.D.N.Y.). On February 4, 2003, Judge Scheindlin granted summary judgment to AMEX, finding the '685 patent invalid as anticipated by a prior publication. Am. Stock Exch., LLC v. Mopex, Inc., 250 F. Supp. 2d 323 (S.D.N.Y. 2003). Following that decision, the parties entered into a Settlement Agreement and Release (the "Mopex Settlement Agreement") which avoided entry of a final judgment of invalidity as to the '685 patent. (RSUF ¶ 9.) The Mopex Settlement Agreement, designed so that it "brought peace," included a covenant by Mopex not to sue "any AMEX-Listed ETF Fund." The Settlement Agreement defines "AMEX-Listed ETF Fund" as follows:

> AMEX-Listed ETF Fund shall mean an Exchange-Traded Fund (as defined below) (i) listed exclusively for trading on the AMEX, (ii) listed exclusively for trading in the United States on the AMEX and also listed on an exchange or marketplace having its principal place of business located outside the United States, or (iii) listed on an AMEX Foreign Joint Venture, as well as any entity associated with the management of that Exchange Traded Fund, including, but not necessarily limited to, the Exchange Traded Fund's sponsor, administrator, auditor, transfer agent, custodian, distributor, investment advisor, lending agent, trustee or board of trustees, trust fund, index compilation agent, and clearing agent or firm.

(RSUF ¶ 11.) The word "listing" is defined in the Agreement to mean "listed for trading on an exchange or marketplace in accordance with the listing rules and

4

standards of such exchange or marketplace and shall not mean or extend to the

trading of a security on an exchange or marketplace pursuant to unlisted trading

privileges." (RSUF ¶ 14.)

The covenant not to sue in the Settlement Agreement provides as follows:

Mopex hereby covenants not to sue, or to otherwise require a royalty or other compensation from, any AMEX-Listed ETF Fund for any alleged infringement of any of Mopex's Patent Rights or alleged infringement of any patent, trade secret, or other intellectual property related to Exchange Traded Funds, provided that such alleged infringement resulted from activities undertaken with respect to or in connection with an Exchange Traded fund that is at the time of the alleged infringement listed for trading on the AMEX or on an AMEX Foreign Joint Venture. This covenant does not apply to (i) any alleged infringement resulting from any activity undertaken with respect to or in connection with an Exchange-Traded Fund that was not listed on the AMEX at the time of the allegedly infringing activity, except with respect to an AMEX Foreign Joint Venture; or (ii) any trading of an Exchange-Traded Fund occurring on an exchange or marketplace other than the AMEX or an AMEX Foreign Joint Venture (the "Other Exchange") if such Exchange-Traded Fund is dually listed not only on the AMEX but also on the Other Exchange.

(emphasis added) (RSUF ¶ 12.) The release is substantially identical in scope.

(RSUF ¶ 13.)

AMEX is defined in the Settlement Agreement to include its successors and

this Court has previously held that NYSE Arca is a successor of AMEX. (RSUF ¶

18.) Leveraged is similarly a successor to Mopex and falls within the definition of

"Mopex" in the Settlement Agreement. (RSUF ¶ 19.)

B.    The ProShares Litigation

On May 5, 2011, Leveraged commenced an action against NASDAQ and its

affiliated entities, and ProShares Trust I and II, alleging claims for infringement of

the '192 patent and '422 patent. Leveraged Innovations, LLC v. NASDAQ OMX

5

Group, Inc., et al., No. 11 Civ. 3203 (S.D.N.Y.) ("ProShares"). ProShares had 127 ETFs that were listed on the NYSE Arca and traded on other exchanges such as NASDAQ. (RSUF ¶ 21-22.) In the summary judgment decision on April 20, 2012, this Court stated: "there is only one question the Court must answer in resolving this motion: does the transfer of all of Amex's ETP and structured product listing and of Amex's ETP business to NYSE Arca make Arca a 'successor' to Amex as contemplated by paragraph 10 of the Settlement Agreement?" Leveraged Innovations, LLC v. NASDAQ OMX Group, Inc., et al., No. 11 Civ. 3203, 2012 WL 1506524, at *5 (S.D.N.Y. Apr. 20, 2012). The Court answered in the affirmative and granted summary judgment thereby dismissing Leveraged's infringement claims with respect to the 127 ProShares ETFs listed on the NYSE Arca. Id. The Court held that Leveraged's claims were barred because NYSE Arca was a successor to AMEX and thus any ETF listed on NYSE Arca is protected by Mopex's covenant not to sue "AMEX-Listed ETF Funds." Id. at 7.

The parties dispute whether the Court implicitly addressed the question of whether the ProShares ETFs were "listed exclusively for trading" on NYSE Arca when it was otherwise addressing whether the ProShares ETFs fit within the ambit of the Mopex Settlement Agreement. Leveraged argues that the ProShares decision "does not interpret the legal meaning of the 'listed exclusively for trading' clause, or the applicability of that provision to Direxion's ETFs." (Leveraged's Mem. in Opp'n 4, ECF No. 49.) Conversely, Direxion asserts that the Court necessarily found that in order to find that the ProShares ETFs were "listed exclusively" on the NYSE

6

Arca it had to implicitly reach this question, and that, in fact, Leveraged implicitly conceded the point. (Direxion's Mem. in. Supp. 8, ECF No. 37).

### C.   Direxion's ETFs

Direxion is an investment company offering 58 ETFs, each of which is listed on NYSE Arca.[3] (RSUF ¶ 28.) Direxion asserts that its ETFs are traded on other exchanges, but are not listed on any exchange other than NYSE Arca. It further argues that these ETFs are neither dually listed nor cross-listed on any other exchange, making them "listed exclusively" on the NYSE Arca.

## II.   STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d

---

[3] As discussed infra, Leveraged asserts that Direxion Daily Gold Bull 3x Shares and Direxion Daily Gold Bear 3x Shares are leveraged commodities pools and not ETFs.

255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

III.    LEGAL PRINCIPALS

New York law provides that courts should enforce the plain meaning of

contracts when that meaning is clear and unambiguous. Greenfield v. Philles

Records, Inc., 98 N.Y.2d 562 (2002). In examining a contract, the Court must "give

effect to the intent of the parties as revealed by the language of their agreement."

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,

Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000) (Sotomayor, J.). Intent is

first derived "from the plain meaning of the language employed in the agreements,

when the agreements are read as a whole." W.W.W. Assocs., Inc. v. Giancontieri,

566 N.E.2d 639, 642 (N.Y. 1990). "[I]f the contract is capable of only one reasonable

interpretation, i.e., is unambiguous, we are required to give effect to the contract as

written." K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir.

1996) (internal quotation marks omitted); see also Fulton Cogeneration Assocs. v.

Niagara Mohawk Power Corp., 84 F.3d 91, 98 (2d Cir. 1996). Contractual language

is ambiguous when it "is capable of more than one meaning when viewed objectively

by a reasonably intelligent person who has examined the context of the entire

integrated agreement." See Lockheed Martin Corp. v. Retail Holdings, N.V., 639

F.3d 63, 69 (2d Cir. 2011). Contract disputes are resolvable on summary judgment

when the contractual language in question is wholly unambiguous. See id. at 68.

In evaluating whether there is ambiguity, the Court must determine the

extent to which it can look at extrinsic evidence. Extrinsic evidence cannot be

considered in order to create an ambiguity. See Garza v. Marine Transp. Lines,

9

Inc., 861 F.2d 23, 26–27 (2d Cir. 1988) ("In the absence of ambiguity, the effect of admitting extrinsic evidence would be to allow one party to substitute his view of his obligations for those clearly stated.") (internal quotation marks omitted); W.W.W. Associates, 77 N.Y.2d at 163 ("It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.") (internal quotation and citation omitted). However, the Court need not ignore context. "[A] court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990); see also Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566 (2d Cir. 2005) ("Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'") (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)).

Evidence of trade practice and custom is appropriate for determining ambiguity in the contract. See Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co., 762 F.3d 165, 180 (2d Cir. 2014) ("Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance."); Kerin v. U.S. Postal Serv., 116 F.3d 988, 992 (2d Cir. 1997) (considering evidence of trade usage to determine that contract's

10

reference to "sewerage service" was ambiguous). Indeed, "[t]erms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry." Sompo, 762 F.3d at 180. Nonetheless, "the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning.' " Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459 (1957)). Put differently, "[f]orm should not prevail over substance, and a sensible meaning of words should be sought." William C. Atwater & Co. v. Panama R.R. Co., 246 N.Y. 519, 524 (1927).

Only if the terms are deemed ambiguous, can the Court then turn to extrinsic evidence to determine the parties' intent. State of New York v. Home Indem. Co., 486 N.E.2d 827, 829 (N.Y. 1985) (per curium). While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008).

IV.    DISCUSSION

ETFs that are "listed exclusively for trading" on the NYSE Arca exchange – a successor-in-interest to AMEX – are protected under the Mopex Settlement Agreement from certain patent infringement suits by Leveraged. Direxion believes that its ETFs, which are listed only on NYSE Arca and not "listed" elsewhere, are accordingly protected. Direxion concedes that its ETFs may be traded elsewhere,

11

but that there is no limitation on trading (vs. listing) in the Mopex Settlement Agreement. Leveraged, however, argues that ETFs are only "listed exclusively" when the listing party has affirmatively obligated itself to list there and nowhere else – in other words, an "exclusive listing." Thus, according to Leveraged, while the Direxion ETFs may be only listed on NYSE Arca, they are not subject to an exclusive listing obligation and therefore are not covered under the agreement.

The key legal issue is, therefore, the meaning of the phrase "listed exclusively." Is it ambiguous, thereby requiring resort to extrinsic evidence, or is it unambiguous? And even if unambiguous, must the Court nonetheless refer to extrinsic evidence as to what the phrase "listed exclusively" meant in the ETF industry as of the date of the agreement, 2003? Leveraged says it must.[4] Leveraged's argument is creative but unavailing. The term "listed exclusively" is unambiguous and does not require resort to any extrinsic source for interpretation.

The Mopex Settlement Agreement is governed by New York law, where that question is a matter of law to be decided by the Court. Mellon Bank v. United Bank Corp., 31 F.3d 113, 115 (2d Cir. 1994). If the language is unambiguous, the Court should give the term its plain meaning and not consider extrinsic evidence. If there is ambiguity, it must then look to extrinsic evidence about what the drafters meant by those words.

---

[4] Although the Court need not reach the collateral estoppel question, there is no reasonable basis for Leveraged to have not made this argument in the ProShares case – where there were 127 ETFs at stake – but then to make it here, had their interpretation been the understanding all along.

A.    Plain Meaning

To determine if ambiguity exists, the Court must decide if the "exclusively

listed" language is objectively capable of more than one meaning. The Mopex

Settlement Agreement does not explicitly define "exclusively listed." Both parties

put forward dictionary definitions for "exclusively" that essentially define the word

as meaning "only." See Klotz v. Xerox Corp., 519 F. Supp. 2d 430, 434 (S.D.N.Y.

2007) ("only" and "exclusively" were deemed equivalent in the context of a forum

selection clause); People ex rel. Melia v. Menachen, 222 N.Y.S.2d 550, 553 (N.Y.

City Ct. 1961) ("The word 'only' is defined by Webster's International Dictionary (2d

ed.) as being synonymous with 'exclusively' or 'solely.'") Leveraged focuses on the

1979 version of Black's Law Dictionary which first defines "exclusively" as "[a]part

from all others; only; solely" and secondarily defines it as "[t]o the exclusion of all

others." (Yang Decl., Ex. K.) None of these definitions is dispositive for either

party. That "exclusively" means "only" is consistent with Leveraged's position that

"only" includes a commitment to list nowhere else. That it means "[t]o the exclusion

of all others" is consistent with Direxion's position that "exclusion" is done by free

choice rather than by contractual prohibition.

Reading the agreements "as a whole," the Court further examines the

language elsewhere in the agreement. See Lockheed Martin, 639 F.3d at 69 ("If the

document as a whole makes clear the parties' over-all intention, courts examining

isolated provisions should then choose that construction which will carry out the

plain purpose and object of the [agreement]") (internal citation and quotation marks

omitted). The release and covenant not to sue in the Mopex Settlement Agreement provide context for the meaning of "listed exclusively." Those provisions state that the parties intended to release any ETF that is "listed on the AMEX at the time of the allegedly infringing activity" and is not "dually listed" on another exchange. (Settlement Agreement ¶¶ 6, 10.) Such language is incongruous with an interpretation of "listed exclusively" requiring a contractual commitment not to list on another domestic exchange. If the parties already understood the contract to require a contractual prohibition, the provision that ETFs not be "dually listed" would be redundant. See Katel Ltd. Liab. Co. v. AT&T Corp., 607 F.3d 60, 64 (2d Cir. 2010) ("Divining the parties' intent requires a court to 'give full meaning and effect to all of [the contract's] provisions.') (quotation marks omitted); Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK), Ltd., 230 F.3d 549, 558 (2d Cir. 2000) ("In a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable."). These provisions instead shed light on "listed exclusively" meaning only that ETFs be listed on AMEX at the time of infringement and that they not be dually listed.

Reading the word "exclusively" – ultimately a descriptive and not proscriptive word – to include a contractual prohibition is beyond the scope of normal usage of the term.

14

B.    Circumstances Surrounding the Mopex Agreement

Leveraged argues that its reading of "exclusively listed" is made clear by the circumstances under which the agreement was made. The parties disagree, however, on the extent to which the Court can establish ambiguity using contextual evidence. As described supra, the Court can consider context, but it would be contrary to New York law to use extrinsic evidence to create facial ambiguity where none otherwise exists. To do otherwise would violate principals of contractual interpretation. See Garza, 861 F.2d at 26–27.

Leveraged refers to several pieces of evidence in an attempt to raise a triable issue as to ambiguity. One such piece of evidence is a declaration from Ken Kiron, who is the President and CEO of Leveraged and who was personally involved in the execution of the Mopex Settlement Agreement. He claims to have understood that "the 'exclusively' term imposed an obligation for the ETF to be listed only on Amex in the United States." (Kiron Decl. ¶ 36.) This is classic extrinsic evidence, unnecessary in the absence of ambiguity. In addition, the Court could not properly consider "uncommunicated subjective intent." Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 302 (S.D.N.Y. 1997), aff'd, 166 F.3d 1201 (2d Cir. 1998).

Leveraged also points to a separate, unrelated agreement executed in 2002 between AMEX and NASDAQ, which, like the Mopex Settlement Agreement, was signed by Michael Ryan. In that agreement, the parties used the term "list exclusively" and obligated listings to remain on AMEX. Leveraged argues that this agreement, made shortly before the Mopex Settlement Agreement, demonstrates

15

that everybody understood "exclusivity" to mean a contractual obligation not to list on another exchange. The Court disagrees. On its face, if anything, the AMEX-NASDAQ agreement merely shows that if the parties in Mopex wanted to require exclusive listings with contractual obligations, they knew how to do it. Furthermore, the market considerations and negotiations (in a deal between two exchanges) may be different than the market considerations and negotiations (in the Mopex deal) such that different language was purposeful.

While that contextual evidence is fruitless, the Court does consider the parties' intentions in making the deal as evidenced by the terms of the Mopex Settlement Agreement itself. See Thompson, 896 F.2d at 721. From AMEX's point of view, the distinction between an ETF choosing to list exclusively with AMEX or being contractually bound to do so makes little difference. What Amex was looking for in the settlement agreement was a way to incentivize ETFs to list with them. (See Kiron Decl. ¶¶ 17, 20; Yang Decl., Ex. M.) So long as they can offer the ETFs protection from patent infringement, it does not matter if the ETFs are contractually bound to list with them or simply choose to do so.

Leveraged argues that failing to contractually require the listing would lead to an "absurd result." They claim that under Direxion's reading, an ETF could reap the benefits of the Mopex Settlement Agreement by temporarily listing on AMEX. The agreement, however, makes clear that the ETF is only entitled to protection if it is "at the time of the alleged infringement listed for trading on the AMEX." (Settlement Agreement ¶¶ 6, 10.) Leveraged also argues that the contractual

16

obligation was implied because ETFs could list on AMEX to gain the protection

from the Mopex Settlement Agreement and then proceed to trade in other places.

An exclusive listing, however, would not affect the ETFs' ability to trade on unlisted

exchanges.

## C.    Industry Custom and Usage

Leveraged next argues that industry custom and usage require that

"exclusively listed" include a contractual obligation. The Second Circuit recently

made clear that evidence of trade practice is only relevant when it pertains to a

particular contractual term; otherwise, the contract's unambiguous terms govern.

Sompo, 762 F.3d at 181. The Court noted:

> Consideration of trade practice may be a useful interpretation aid where
> there is a term in the contract that has an accepted industry meaning
> different from its ordinary meaning or where there is a term with an accepted
> industry meaning that was omitted from the contract. But [appellant] does
> not claim that there is such a term of art included or omitted here. Trade
> practice is therefore irrelevant in this case, and the contract's unambiguous
> terms govern.

Id. at 181 (quoting Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1373

(Fed. Cir. 2002)). In support of its argument, Leveraged submitted a declaration

from Roel Campos, a former SEC commissioner, in opposition to Direxion's motion.

(ECF No. 53.) In his first and only timely declaration, Campos states in his

declaration that "exclusive listing" agreements existed in 2003 when the Mopex

Settlement Agreement was constructed. He asserts that "exclusive listing"

agreements had a particular meaning at that time – one that included a contractual

obligation. He does not address the fact that the contract here does not use the

17

words "exclusive listing" – but uses an entirely different phrase "listed exclusively."
As the declaration consists of contextual information unrelated to the actual terms
of the Mopex Settlement Agreement, it is therefore irrelevant. Campos says
nothing about the particular "listed exclusively" language, nor does he even refer
directly to the agreement. His opinion does not shed light on what the phrase
"listed exclusively" means in ordinary parlance. Even accepting that "exclusive
listing" agreements were a term of art, Leveraged cannot satisfactory explain why
the parties did not then refer to "exclusive listing" agreements in the Mopex
Settlement Agreement.[5]

In its reply, Direxion remarked on the fact that the Mopex Settlement
Agreement uses a different term from that discussed by Campos. At oral argument,
the Court did as well. Only then did Leveraged attempt to rectify this obvious
deficiency by submitting yet another Campos declaration in which he said "listed
exclusively" would mean the same thing. This declaration was untimely and – in
light of its timing – clearly lawyer devised. The Court disregards it as untimely.

Leveraged ultimately lacks admissible evidence to demonstrate ambiguity in
the phrase "listed exclusively."[6]

---

[5] Direxion further challenges the Campos declaration on the grounds that he discusses "exclusive
listings" where the Mopex Settlement Agreement discusses "listed exclusively." Leveraged argues
that these terms are one and the same. But this is not just a transposition issue; "exclusively" in
"listed exclusively" is an adverb whereas "exclusive" in "exclusive listing" is an adjective. These
words have different meanings in the context of terms of art. For example, there may be an
exclusive listing in the real estate context or an exclusive license in the patent context, but it is
unclear that changing "exclusive" into its adverb form has the same meaning in those contexts.
Leveraged simply failed to ask Campos whether "listed exclusively" was understood at the time to
mean the same thing as an "exclusive listing agreement."

[6] Extrinsic evidence is inadmissible here as the language is unambiguous. The Court can stop its
inquiry there. But "even if extrinsic evidence of the contracting parties' intent were admissible,

18

### D.    Direxion's Daily Gold Funds

Finally, Leveraged argues that Direxion's Daily Gold Bull 3x Shares and

Daily Gold Bear 3x Shares (the "Daily Gold Funds") do not fall within the scope of

the Mopex Settlement Agreement because they are not ETFs as defined in the

agreement.  Leveraged asserts that these funds, which hold futures contracts linked

to the value of gold, are leveraged commodities pools that are taxed as partnerships.

The Mopex Settlement Agreement defines ETFs to mean,

> an investment company – whether organized as a management company,
> business trust, or unit investment trust – that (1) is structured in such a way
> as to allow its shares to be traded on a securities exchange or marketplace
> and (2) issues continuously redeemable securities that may be bought from
> the fund at net asset value or sold to the fund at net asset value.  For the
> purpose of this Agreement only, the term "Exchange-Traded Fund" shall also
> include funds organized as grantor trusts.

(Settlement Agreement ¶ 1.)  The Mopex Settlement Agreement does not further

define "investment company."

The Daily Gold Funds are shares of the Direxion Shares ETF Trust II, which

is organized as a Delaware statutory trust and constitutes an "emerging growth

company" within the meaning of the Securities Act of 1933.  (Yang Decl., Ex. H,

ECF No. 51.)  A Delaware statutory trust is an association "including but not

limited to a trust of the type known at common law as a 'business trust.'"  Del. Code

Ann. tit. 12, § 3801(a)(1); Debussy LLC v. Deutsche Bank AG, 242 Fed.Appx. 735,

736 n.1 (2d Cir. 2007); France v. Thermo Funding Co., 989 F.Supp.2d 287 , 298 n. 68

---

extrinsic evidence of intent would only be relevant insofar as it clarified what the contracting parties
intended" the language to mean.  Sompo, 762 F.3d at 180.  After examination of all of the evidence,
the Court does not find sufficient evidence demonstrating that the parties intended the language to
include a contractual obligation.

(S.D.N.Y. 2013) ("Delaware statutory trusts meet this Court's definition of a business trust.") Accordingly, the Daily Gold Funds are "investment companies" under the Mopex Settlement Agreement because they are organized under Direxion Shares ETF Trust II which is a "business trust."

Leveraged nonetheless asserts that the Daily Gold Funds state in their own prospectus that "neither the trust nor any fund is a mutual fund or any other type of investment company as defined in the Investment Company Act of 1940."[7] Leveraged accordingly asks the Court to define "investment company" solely based on the Investment Company Act of 1940. The Act is an inappropriate basis for defining "investment company" because it uses too narrow a definition of "investment company," and nothing in the Mopex Settlement Agreement indicates that the term should be so limited. The Act is not the sole method of defining the term "investment company." For example, the U.S. Treasury Department found the Act's definition of "investment company" too narrow to apply to money laundering programs, and it instead recognized "unregistered investment companies" including commodity pools similar to commodity ETFs. (Ledley Decl., Ex. 4., ECF No. 39.) Here, the Daily Gold Funds are listed and traded on NYSE Arca like the other ETFs. Leveraged admits that all of the Direxion ETFs – including the Daily Gold Funds – offer shares that are traded on an exchange and are redeemable securities that may be bought from and sold at net asset value. (RSUF ¶ 27.) The Mopex

---

[7] In ProShares, the Court protected commodity ETFs, with identical language about not being "investment companies" as defined in the Act, under the Mopex Settlement Agreement. The parties did not, however, directly litigate the question of whether the commodity ETFs were investment companies as defined in the agreement.

Settlement Agreement does not mention the Act, but instead refers to "investment company" with a more expansive lense, as indicated by incorporating grantor trusts. To limit the term "investment company" in this context would be to go against the purpose of the agreement, which was to "buy peace" between Mopex and AMEX. Accordingly, the Mopex Settlement Agreement should not exclude the Daily Gold Funds simply because they are commodities ETFs.

V.     CONCLUSION

For the reasons set forth above, summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at ECF No. 28 and terminate this action.


SO ORDERED.

Dated:     New York, New York
           November 18, 2014

                                        _____
                                            KATHERINE B. FORREST
                                            United States District Judge